## Joe THOMAS *v.* INTERNATIONAL HARVESTER CREDIT CORPORATION and CARCO INTERNATIONAL, INC.

CA 81-384                                    636 S.W.2d 296

Court of Appeals of Arkansas
Opinion delivered June 30, 1982
[Rehearing denied August 18, 1982.]

*Hal W. Davis* of *Walters, Davis & Cox*, for appellant.

*James M. McHaney, Jr.* of *Owens, McHaney & Calhoun*, for appellee International Harvester Credit Corp.

*Rex M. Terry* of *Hardin, Jesson & Dawson*, for appellee Carco International, Inc.

MELVIN MAYFIELD, Chief Judge. This case involves the Uniform Commercial Code's provision about a secured party's right to dispose of collateral after default.

In 1978 the appellant, Joe Thomas, bought four items of equipment from the appellee, Carco International, Inc., an International Harvester franchise dealer in Fort Smith. Three items, a bulldozer, a dump truck, and a backhoe-loader, were financed by security agreements which were assigned by Carco to the other appellee, International Harvester Credit Corporation. The security agreement on the fourth item, a three-axle trailer, was assigned to the First National Bank of Fort Smith who was never a party in this matter.

During the year 1980 Thomas became delinquent in his payments on all four items and on July 29, by agreement with a representative of International's credit company, the equipment was placed on Carco's lot to expose it to prospective purchasers in furtherance of the attempt Thomas was making to sell it. Two days later, Carco wrote Thomas that there would be a "public sale" of the equipment at Carco's place of business at 3:00 p.m. on August 15, 1980, and on August 4 a Fort Smith newspaper contained an ad to the same effect.

Thomas testified he went to Carco's to see about this and was told by Mr. Carl M. Corley that his son "jumped the

gun on this thing" and there would be no sale on the 15th. Within a few days, however, Thomas received a letter from Carco, signed by Carl M. Corley's son, saying that Carco had purchased the equipment "as of August 18, 1980."

The two different dates resulted from the fact that International's credit company sent Thomas notice, dated August 7, that unless the equipment "has been redeemed on or before 8/18/80 the same will be sold at private sale." Thomas testified this letter was not actually received by him until after August 18 but does not deny that it was mailed on the 7th. From the evidence at the trial we know that Carco paid off the amounts due by Thomas and took reassignments of the security agreements from the credit corporation and the bank. We also know that the dump truck was still at Carco's on January 28, 1981, and on that date Thomas filed a complaint in chancery court seeking to enjoin Carco from disposing of it and for damages for disposing of the other equipment. Apparently the injunction was not granted or not pressed and only the damage issues were eventually tried. The trial court found that the equipment was disposed of in a commercially reasonable manner; that there was nothing due Thomas because the equipment failed to sell for enough to pay what was owed on it; and the complaint against Carco and International's credit company was dismissed. We agree as to the credit company. We remand as to Carco.

Many issues are raised and this case, like the Commercial Code, is difficult to embrace. It has been said that although the Code places a positive duty on the secured party to act, with respect to every aspect of disposition, in a commercially reasonable manner, the specifics of this duty cannot be meaningfully described except in terms of particular fact situations. *Chittenden Trust Co. v. Maryanski,* 415 A.2d 206 (Vt. 1980). In *Farmers Equipment Co. v. Miller,* 252 Ark. 1092, 482 S.W.2d 805 (1972), our Supreme Court said: "We cannot say that there was not a jury question as to appellant's good faith and the commercial reasonableness of every aspect of the disposition of the collateral." Without belaboring the issue, we affirm the finding in the instant case that the equipment was disposed of in a commercially

reasonable manner because we think the question was one of fact and we cannot say that the chancellor's finding was clearly against the preponderance of the evidence. See Civil Procedure Rule 52 (a).

After there has been a commercially reasonable disposition of collateral, Ark. Stat. Ann. § 85-9-504 (Supp. 1981) provides that the proceeds of the disposition (as far as is involved here) shall be applied (1) to the reasonable expenses of retaking, holding, preparing for sale and sale; (2) to the satisfaction of the indebtedness secured by the security interest under which the disposition is made; and (3) any surplus to be returned to the debtor. The chancellor found there was no surplus to be returned in this case but we do not believe that finding was correct.

In an attempt to make the basis of our determination clear, we first point out that we do not think Carco purchased the equipment at any sale. Ark. Stat. Ann. § 85-9-504 (3) provides that the secured party may not buy at a private sale unless the collateral "is of a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations." *Norton* v. *National Bank of Commerce,* 240 Ark. 143, 398 S.W.2d 538 (1966), held that a used automobile did not come within the term "a type customarily sold on a recognized market" and in *Carter* v. *Ryburn Ford Sales,* 248 Ark. 236, 451 S.W.2d 199 (1970), the court said a NADA book was not a "widely distributed standard price quotation" since the proof showed it to be merely a guide to the price of a vehicle of that year, make and model in an average condition. There is nothing in the record in the instant case from which we can hold that the equipment involved here could have been legally purchased by Carco at a private sale.

With regard to the August 15 public sale, the trial court said:

No bid was made by any prospective purchaser to purchase all four items of equipment, and the defendant, Carco International, Inc., therefore elected to purchase the equipment as a unit, *and the sale was*

*completed on August 18, 1980,* for the full amount of the indebtedness on all four items of equipment which are the subject matter of this action. (Emphasis supplied.)

Carco's president, Mr. Corley, testified that because International's credit company gave notice for a private sale on or after August 18, 1980, the bidders at the public sale on August 15 were told "before they ever made their bids that it would not be consummated — or the bids would not be accepted until the 18th." Also, Mr. Corley wrote Mr. Thomas and said that Carco had purchased the equipment "as of August 18, 1980."

This evidence shows that while bids were taken on August 15, there was no sale until a bid was accepted on the 18th. So we find that Carco could not have legally purchased the equipment at the private sale on the 18th and did not purchase the equipment at a public sale on the 15th. If the finding of the chancellor is contrary, we hold it clearly against the preponderance of the evidence.

We say "if the finding of the chancellor is contrary" because we are not sure that it is. In determining that there was no surplus to be returned to Thomas, the chancellor made specific findings as to the amount of the indebtedness on each item of equipment and the amount of expenses allowed Carco for retaking, holding, preparing for sale and selling each item. Those amounts were then compared with the amounts for which Carco eventually sold each item. In other words, these findings by the chancellor would not be necessary if Carco purchased the equipment at a public sale on August 15.

In any event, we think the chancellor's finding on Carco's 15% "handling charge" was clearly erroneous. This was described by Carco's president as the "ordinary cost of doing business." His father said it includes storage and salesman's commission and expenses.

The appellant cites the case of *Cherner* v. *Lawson,* 162 A.2d 492 (D.C. 1960), where the court in refusing to approve

a 15% "cost of doing business" charge said that a defaulting purchaser was not "liable for expenses which are incurred incident to doing business and which would have been incurred by the vendor if no default in this particular sale had ever occurred."

We agree with that reasoning. In the instant case the backhoe was resold by Carco on August 20, 1980, the dozer on August 25, and the trailer on October 30. When we consider that Thomas put the equipment on Carco's lot at his own expense; the short period of time before these three items were resold; and the lack of any detailed information relating expenses of those items to the general 15% "handling charge"; we think the charge should not have been allowed. The situation as to the truck is different. It was not resold until April of 1981. We do not reverse the 15% handling charge as to that item and base our action on our finding that we cannot say that charge in this case is clearly against the preponderance of the evidence.

The handling charge allowed for the three items totalled $4,761.83. Each of these items sold, even with the handling charge included, for more than the indebtedness against them. There was, however, a loss on the truck. The total loss as computed by the chancellor was $359.78. We subtract that amount from $4,761.83 and hold that Thomas is entitled to judgment against Carco for the difference of $4,402.05 plus cost of this appeal and interest of 6% from trial and 10% from entry of judgment on remand.

We have not overlooked appellant's argument that each item of equipment should be considered separately and the loss on the truck should not be offset against the gain on the other items. We think it enough to say that we do not agree under all the facts and circumstances of this case.

Remanded for judgment in keeping with this opinion. Affirmed as to International Harvester Credit Corporation.

COOPER, J., concurs.